## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Crestmark Bank,

     Plaintiff,

v.

Electrolux Home Products, Inc.,

     Defendant.

Case No. 14-cv-11595
Hon. Judith E. Levy
Mag. Judge David R. Grand

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [35] AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [36]

This matter comes before the Court on cross motions for summary judgment regarding a contract dispute between plaintiff, Crestmark Bank, and defendant, Electrolux Home Products, Inc., and their rights to tools and molding equipment, finished component parts intended for purchase by defendant, and raw materials. This property was located at the facilities of Tarheel Plastics, LLC ("Tarheel"), a manufacturer-supplier for defendant and debtor to plaintiff, that had ceased business operations in early October 2013. Plaintiff asserts that that defendant

1

breached the parties' agreement, while defendant argues that the agreement lacked proper consideration, and, in any event, the terms that were not impossible were fully performed.

At stake is $332,000.00 in an escrow account funded by defendant pursuant to the Accommodation Agreement. Defendant has brought counterclaims for tortious interference with contract, tortious interference with business relations, unfair and deceptive trade practices under North Carolina law, unjust enrichment, conversion, and declaratory relief that Electrolux is entitled to offset the costs of the resins it purchased on Tarheel's behalf. (Answer and Counterclaims, Dkt. 18.)

## I.   BACKGROUND

### A. Electrolux and Tarheel

Tarheel, located in North Carolina, manufactured injection-molded plastic parts for assembly into appliances made by Electrolux beginning in 2008, and continuing until it ceased operations on October 2, 2013. (Rakes Aff., Def. Mot. Ex. 1, Dkt. 38-2 at 1; Lund Dep., Def. Mot. Ex. 6, Dkt. 38-7 at 11.)   Suppliers like Tarheel bid for

2

manufacturing projects with Electrolux through a web portal, into which a quote is submitted regarding price, quantity, delivery, and other specifications for a specific project. (Rakes Aff., Dkt. 38-2 at 1-2.) If Electrolux found that quote acceptable, it posted a purchase order, along with terms of sale, for the manufacturer-supplier to accept through the web portal. (*Id.* at 2.) The terms of such an agreement provided, in part, "Set-off: Buyer [Electrolux] shall be entitled to set off any amount owing at the time from Seller to Buyer or any of its affiliated companies against any amount payable at any time by Buyer or any of its affiliated companies to Seller." (Terms and Conditions of Sale, Def. Mot. Ex. 2, Dkt. 38-3 at 2.) Tarheel ordered the raw materials, called resins, used to manufacture the parts from Electrolux, and "then from time to time Electrolux offset the costs of the resins ordered by Tarheel against Tarheel's open manufacturing invoices." (Rakes Decl., Dkt. 38-2 at 2.)

A UCC Financing Statement, filed with the North Carolina Secretary of State on December 28, 2011, recorded the bailment of, and security interest in, specific tools owned by Electrolux and placed into the possession of Tarheel. (Def. Mot., Ex. 4.) A Tooling Agreement,

executed on February 8, 2013, between Tarheel and Electrolux describes a *different* list of tools from that in the 2011 UCC Financing Statement, but similarly makes it clear that Electrolux maintained the ownership of the equipment provided to Tarheel for the manufacture of parts Electrolux would then purchase. (Tooling Agreement, Def. Mem., Ex. 3, Dkt. 38-4.) Tarheel shared this understanding that the equipment and molds belonged to Electrolux during the entire course of the relationship between the two companies. (Scott Dep., Def. Suppl. Mem., Ex. A, Dkt. 55-2 at 4.) The tooling agreement required Electrolux to have "plainly marked" its equipment and barred Tarheel from tampering or removing these markers. (Tooling Agreement, Def. Mem., Ex. 3, Dkt. 38-4 at 1.) Tarheel promised to "not allow the Tooling to become encumbered in any way as a result of any act or omission of Seller [Tarheel]." (*Id.* at 2.) The agreement also indicates that, even if a court determined that Electrolux had not retained ownership of the tooling, Tarheel "hereby agrees to be deemed to have granted Buyer a security interest giving Buyer all the rights of a secured creditor as to the Tooling under the Uniform Commercial Code as in effect in that jurisdiction." (*Id.*)

4

The relationship between Electrolux and Tarheel was based on a just-in-time manufacturing supply, meaning that there would have been very little time available for Electrolux to change suppliers if one manufacturer ceased operations. (Stones Dep., Def. Mem. Ex. 9, Dkt. 38-10 at 7.) Electrolux projects represented ninety-five percent of Tarheel's business. (Lund Dep., Pl. Mem. Ex. 5, Dkt. 36-2 at 37; *but see* Scott Dep., Def. Suppl. Mem., Ex. A, Dkt 55-2 at 9 (estimating that Electrolux accounted for 90% of Tarheel's business).)

Electrolux provides documentation that, when Tarheel ceased operations in early October, Tarheel owed Electrolux $240,450.00 in resin debits, as well as another $211,506.00 in "inventory at Tarheel," and that Electrolux owed Tarheel $264,901.60 in open invoices for component parts received between June and October of 2013. (Rakes Aff., Def. Mem., Ex. 1 at 8.) A Tarheel minority partner testified that "hundreds of thousands of pounds" of resin filling three storage silos was onsite at Tarheel at the time it ceased operations, although he did not state a value for this material. (Scott Dep., Def. Suppl. Mem., Ex. A, Dkt. 55-2 at 9.)

5

## B. Crestmark and Tarheel

Crestmark was Tarheel's primary lender, holding a line of credit with Tarheel for approximately $1,200,000.00. The earliest evidence of this relationship is a promissory note and security agreement dated November 27, 2012. (Pl. Mem., Ex. 1, Dkt. 36-2 at 1-2; Lund Dep., Pl. Mem. Ex. 5, Dkt. 36-2 at 36-37.) In consideration for the loan, Tarheel

> grant[ed] to Crestmark a security interest in all of its assets, now existing or *hereafter arising*, wherever located included All Accounts, Goods, Inventory, *Equipment*, . . . books and records and supporting obligations for any of the foregoing, and all Proceeds of the foregoing (the "Collateral"), to secure repayment of the Obligations ("Security Interest").

(Pl. Mem., Ex. 2, Dkt. 36-2 at 6 (emphasis added).) Three individuals, Joseph Nelson, Daniel Scott, and Craig Ward personally guaranteed the loans. (Pl. Mem., Ex. 3 at 28-29.) Crestmark recorded its security interest on November 5, 2012. (UCC Financing Statement, Def. Mot. to Stay, Ex. C, Dkt. 3-3 at 2 (describing the collateral as "[a]ll assets of the Debtor now owned or hereafter acquired and wherever located").)

The security agreement included the representation that Tarheel "is the owner of all the Collateral and there are no other liens or claims against the Collateral, except the Security Interest of Crestmark or as

6

shown on the Schedule," and that "[t]he Inventory and Equipment are and shall remain free from all liens, claims, encumbrances, and security interests (except as held by Crestmark, and except as identified on the Schedule)." (Pl. Mem. Ex. 2, Dkt. 36-2 at 8-9.)  The agreement excluded from inventory anything that was "subject to any license or other such agreement that limits, conditions, or restricts [Tarheel's] or Crestmark's right to sell or otherwise dispose of such Inventory." (*Id.* at 20.)  The evidence does *not* show that a list of Electrolux tooling was appended or otherwise exempted from this lien.

The Crestmark-Tarheel relationship also included acknowledgment by Crestmark of the resins-purchasing offset program—that "[Tarheel] from time to time got these small invoices from Electrolux that would offset against the receivables and it had been fairly small by comparison." (Lund Dep., Pl. Mem., Ex. 5, Dkt. 36-2 at 38.)  However, Crestmark understood the offset program to be "a fairly small number," and there had been "very few adjustments" in the roughly year and a half in which Crestmark managed the credit line with Tarheel.  (*Id.* at 39.)

On September 30, 2013, Crestmark officials traveled to the

7

Tarheel facility in North Carolina to audit its books and determine if Tarheel should continue or cease operations. (Lund Dep., Pl. Mem. Ex. 5, Dkt. 36-2 at 32-34.) The records documenting the raw-material offset program with Electrolux were missing, apparently taken by the majority owner, Mr. Nelson, when he suddenly left the company. (*Id.* at 35; *see also* Scott Dep., Def. Suppl. Mem., Ex. A, Dkt. 55-2 at 9-11 (testifying that Mr. Nelson left Tarheel on September 13, 2013, after the minority partners discovered that he had falsified payroll-tax information and kept information about the offset program with Electrolux off the company's books).) The minority owners of Tarheel, Mr. Scott and Mr. Ward, represented to Crestmark that they were not knowledgeable about the offset program. (*Id.* at 38.)

The analysis prepared on October 1, 2013 by Crestmark with the minority owners demonstrated that Tarheel could not continue operations. (*Id.* at 42-43.) The Statement of Accounts prepared by Crestmark and dated October 16, 2013 demonstrates that Electrolux-related companies had past-due balances of $1,109,006.67. (Pl. Mem. Ex. 6, Dkt. 36-2.)[1]

---

[1] Plaintiff, in its brief, states this amount as $1,110,006.67, but the

A cash-flow projection and analysis created between September 30 and October 1, 2013 demonstrated to Crestmark that Tarheel had a negative cash flow that would continue to grow through the Fall of 2013, and led Crestmark to cease its lending of operating funds and terminate Tarheels operations on October 2, 2013. (Lund Decl., Pl. Suppl. Mem., Ex. 2, Dkt. 56-1 at 23.) There is significant disagreement between the parties regarding the meaning of this cash-flow analysis: Electrolux asserts that this analysis supports its contention that Tarheel owed it money at the time it ceased operations, while Crestmark asserts that it has no relevance to the current dispute and merely modeled cash-flow through the Fall of 2013 to help the lender decide if operations should be terminated. (*Compare* Def. Suppl. Mem., Dkt. 55 at 4-5; Pl. Suppl. Mem., Dkt. 56 at 4-7.)[2]

### C. Crestmark and Electrolux

Electrolux provided a letter to Crestmark dated March 1, 2013

---

documentation provided does not support this assertion. *See* totals at 71 ($794,779.48), 73 ($209,825.06), 74 ($102,381.20), 75 ($2,020.93).

[2] The parties also dispute the format in which this document was provided to plaintiff. (Def. Suppl. Mem., Dkt. 55 at 5-8; Pl. Suppl. Mem. at 13-15.) The marked disagreement between the parties regarding the interpretation of this document creates a genuine issue of material fact, which cannot be resolved under Rule 56 motions.

notifying the lender of its secured interest in tooling located at Tarheel. (Def. Mem. Ex. 5, Dkt. 38-6.)  No list of tools is attached to this exhibit. (*Id.*)   Soon after, by letter dated March 11, 2013, an Electrolux purchasing agent released any security interest the company held in Tarheel's accounts receivable or inventory.   (Electrolux Letter, Pl. Mem., Ex. 4, Dkt. 36-2 at 30.)

Between October 1 and October 3, 2013, Crestmark official Lund spoke with an Electrolux official regarding tools and parts ready for shipment ("component parts") at Tarheel.  (Lund Dep., Pl. Mem. Ex. 5, Dkt. 36-2 at 48.)  Crestmark conditioned Electrolux's ability to remove the tools and molds from Tarheel on having "ma[d]e arrangements to settle out all accounts receivables."  (*Id.*)

> Q: So you informed them—it's Crestmark's position that you informed Electrolux that they could pick up their tooling and molds?
>
> A: If we came to an agreement with settling out our account, yes.

(*Id.*)  An Electrolux employee onsite at Tarheel between October 1 and 4, 2013 explained that they were barred from gaining access to the tools and equipment.  (Stones Dep., Def. Mem., Ex. 9, Dkt. 38-10 at 8.)  One

10

of the Tarheel minority partners confirmed that Crestmark would not allow finished product or tooling to leave the Tarheel plant, that Electrolux communicated its urgent need for the product and molds, and that he had explained Electrolux's urgent need for the molds to Crestmark. (Scott Dep., Def. Suppl. Mem., Ex. A, Dkt. 55-2 at 7-8.)

The evidence provided does not clarify whether Crestmark was either fully informed or had notice regarding which equipment at the Tarheel plant was the property of Electrolux. Crestmark engaged in its promissory note and security agreement with Tarheel after Electrolux filed its 2011 security interest in a subset of the tooling at Tarheel. This UCC financing statement filed by Electrolux in 2011 appears to itemize the same parts as the first page of Schedule 4.B of the Accommodation Agreement. These facts establish that Crestmark entered the loan agreement with notice of Electrolux's priority security interest in the subset of equipment and molds itemized in the 2011 UCC filing. (*Compare* Def. Mem., Ex. 3, Dkt. 38-4 at 5-6; Pl. Mem., Ex. 23, Dkt. 36-3 at 97.) The Tooling Agreement executed on February 8, 2013 between Electrolux and Tarheel appears to cover the same tools that are itemized on the second and third pages of Schedule 4.B of the

11

Accommodation Agreement.  (*Compare* Def. Mem., Ex. 3, Dkt. 38-4 at 5-6; Pl. Mem., Ex. 23, Dkt. 36-3 at 98-99.)  However, the record does not clarify whether Crestmark or Electrolux had the priority secured interest in this subset of tools.  There is no UCC filing regarding this subset; nor is there an explanation of how this arrangement was allowed in light of Crestmark's all-asset lien, which included after-acquired equipment.   The record does not show that Crestmark had information about which tools at Tarheel belonged to Electrolux or that it had documentation from Electrolux regarding its accounting of the invoices and resin offset program with Tarheel.[3]

To resolve the standoff over access to the finished component parts, tools and molds, Tarheel, Crestmark, and Electrolux executed an Accommodation Agreement on October 4, 2013.  (Def. Mem., Ex. 11, Dkt. 38-12.)  On October 1, 2013, Electrolux's counsel, David Conaway, contacted Crestmark's counsel, Thomas Coughlin, indicating a desire to speak "first thing" to discuss tooling owned by Electrolux and in

---

[3] Plaintiff frames this as a situation in which Electrolux did not produce this information, (*see* Knudsen Dep., Pl. Mem., Ex. 7, Dkt. 36-2 at 78-79), while defendant frames this as a situation in which Crestmark refused invitations to visit Electrolux's headquarters and review the records there.  (Lund Dep., Def. Mem., Ex. 6, Dkt. 38-7 at 17.)

Tarheel's possession.   (Pl. Mem., Ex. 8, Dkt. 36-2 at 83.)   Coughlin recounts that Conaway asked about recovery of inventory and tooling at Tarheel, as well as whether Crestmark would consider funding further production, and the attorneys discussed an accommodation agreement. (Coughlin Dep., Pl. Mem., Ex. 9, Dkt. 36-2 at 87-88.)   Crestmark was aware that Conaway stressed Electrolux's urgency in this matter.   (*Id.* at 89.)

The record demonstrates that Conaway and Coughlin proceeded to negotiate the Accommodation Agreement through multiple iterations between October 2 and October 4, 2013, with acceptable terms reached on Friday, October 4, 2013.   (Pl. Mem., Ex. 11-22, Dkt. 36-2, 36-3.) Electrolux provides a letter dated October 3 stating that Crestmark demanded the monetary terms for the $100,000.00 payment and $332,000.00 escrow funds that morning, along with additional terms for Electrolux to fund Tarheel's continuing operations.   (Oct. 3, 2013 Conaway Letter to Coughlin, Def. Mem., Ex. 10, Dkt. 38-11 at 2-3.) Conaway clearly announced in this letter Electrolux's extreme dissatisfaction with these terms and its urgent need to recover its tooling.   (*Id.*)   In the course of these rapid negotiations, Electrolux

13

suggested modified monetary terms in an email from Conaway to Coughlin later in the day on October 3, offering "$100,000 immediately upon loading the on hand parts and tooling on Electrolux designated trucks (tomorrow morning). . . [and] Electrolux will also wire tomorrow morning $332,000 into escrow, pending a good faith and best efforts reconciliation by the parties of the amounts owed by Electrolux to Tarheel on outstanding invoices." (Pl. Mem., Ex. 13, Dkt. 36-3 at 11.) More red lining of the agreement ensued before a final version was executed on the afternoon of October 4, 2013. (*Id.* at Ex. 22-23, Dkt. 36-3.)

As part of the Accommodation Agreement, Crestmark relinquished any interest in Electrolux's tooling; in turn, Electrolux relinquished any interest in "any inventory or equipment other than" the tooling it owned. (Pl. Mem., Ex. 23, Dkt. 36-3 at 92.) The Agreement further established that 1) Electrolux would immediately pay Crestmark $100,000.00, in exchange for the finished parts that had not yet been shipped to Electrolux, and without any resin setoff; 2) Electrolux would wire to Crestmark's counsel $332,000.00, to be held in escrow pending a reconciliation with five days of the outstanding

14

invoices owed to Tarheel; 3) upon Crestmark's receipt of these two payments, Electrolux would have the right to take immediate possession of its tooling; and 4) the only allowed setoffs for resins would be "the verifiable, actual cost of plastic resins or other raw materials paid for by Customer and delivered to Supplier and ultimately used by Supplier to produce that individual Component Part [shipped or to be shipped to Electrolux]." (*Id.* at 91-92.)  Electrolux also had the option to take possession of resins and raw materials that it had supplied to Tarheel and then issue a credit in Tarheel's favor.  (*Id.* at 91.)

The Accommodation Agreement provides that it is governed by Michigan law and that jurisdiction "will be proper in federal district court or in state court in Oakland County [Michigan]." (*Id.* at 93.)  A three-page list of itemized tools belonging to Electrolux was attached to the agreement.  (*Id.* at 97-98.)  Coughlin emailed Conaway late on Friday, October 4, 2013 to confirm that the wires had been received and Electrolux was free to take possession of the finished component parts and its tooling from the Tarheel facility.  (Pl. Mem., Ex. 24, Dkt. 36-3 at 100.)  He indicated that Electrolux was also free to take raw materials, subject to further reconciliation, but would need someone from Tarheel

15

or Crestmark present to monitor the quantity taken.  (*Id.*)

By Thursday of the following week, October 10, 2013, Electrolux had been able to remove all of its tooling and molds from the Tarheel facility.  (Knudsen Dep., Pl. Mem., Ex. 7, Dkt. 36-2 at 80-81.)  Neither party asserts that Electrolux was forced to suspend its operations or incur any fines due to the shut-down of the Tarheel operation.  (*Id.* at 82; Stones Dep., Pl. Mem., Ex. 25, Dkt. 36-3 at 106.)

On October 10, 2013,[4] Electrolux provided Tarheel with the documentation reconciling open invoices and resin credits.  (Pl. Mem., Ex. 26, Dkt. 36-4; Def. Mem., Ex. 12, Dkt. 38-13.)  Crestmark had allowed Electrolux an extra day to provide the reconciliation. (Matheson Dep., Def. Mem., Ex. 7, Dkt. 38-8 at 10.)  The parties disagree on the validity and meaning of these documents.  Electrolux claims that the reconciliation documented that Tarheel owed Electrolux $156,976.86 after the resins had been offset from open invoices.  (Def. Mem., Ex. 12, Dkt 38-13 at 2.)[5]  By contrast, Crestmark found this

---

[4] Plaintiff states this was on October 10, 2013 (Pl. Mem., Dkt. 36 at 21), while defendant states this was on October 11, 2013. (Def. Mem., Dkt.35 at 17.)  An email from Conaway to Coughlin dated October 10, 2013 resolves this discrepancy.  (Pl. Mem., Ex. 26, Dkt. 36-4 at 1: Def. Mem., Ex. 12, Dkt. 38-13 at 1.)

[5] Electrolux further asserts that by June of 2015, this net amount owed to Electrolux was $158,754.40.  (Rakes Aff., Def. Mem., Ex. 1, Dkt. 38-2 at 3.)

16

initial reconciliation unacceptable because it documented all resins delivered, rather than the resin actually used to manufacture parts, it featured no signatures, and it had handwritten amounts on it, which made it unreliable. (Lund Dep., Pl. Mem., Ex. 5, Dkt. 36-2 at 53.) It is undisputed that this first reconciliation documented all resins shipped to Tarheel, rather than a calculation of the resin actually used in finished parts. (Rakes Dep., Pl. Mem., Ex. 34, Dkt. 36-8 at 4-5.)

On November 14, 2013, Coughlin provided Conaway with a detailed explanation of how the first reconciliation failed to satisfy the terms of the Accommodation Agreement and allow for resolution of the $332,000.00 in the escrow account, stressing that only the resins actually used to mold parts that were sold to Electrolux could be applied as an offset to the open invoices. (Pl. Mem., Ex. 27, Dkt. 36-6.) Coughlin explained that, based on what it had been able to learn from Tarheel, as well as information from Electrolux, it estimated the cost of raw materials to be between 62% and 66% of the invoice amount. (*Id.* at 2; *but see* Scott Dep., Def. Suppl. Mem., Ex. A, Dkt. 55-2 at 6 ("60 percent of your total cost i[s] typically resin.").) Coughlin sought Electrolux's consent to release the escrow funds to Crestmark, based on

17

the documentation Crestmark provided that the $1,109.760.00[6] in open invoices would yield $709,760.00 in allowed setoffs under the terms of the Accommodation Agreement, and result in Electrolux owing $399,246.00, with $332,000.00 already held in the escrow account. (*Id.*)

Conaway responded on December 6, 2013, to indicate that Electrolux was preparing additional information. (Pl. Mem., Ex. 29, Dkt. 36-6 at 28.) On January 7, 2014, with no additional information forthcoming, Coughlin renewed his demand for consent to release the escrow funds. (Pl. Mem., Ex. 31, Dkt. 36-6.)

On January 21, 2014, Electrolux provided a second reconciliation, which it described as demonstrating $240,540.00 in resins used in parts listed in the open invoices, and explained the formula it used to calculate that amount. (Def. Mem., Dkt. 35 at 18; Ex.1, Dkt. 38-2 at 4-5.) Electrolux asserts that the only way to calculate the amount of resins actually used, rather than deriving an estimate, would have been to observe the actual production of each part. (Def. Mem., Dkt. 36 at 18.) Electrolux also identified open invoices with Tarheel in the amount of $264,901.60. (*Id.*; Ex. 1, Dkt. 38-2 at 2.) Crestmark asserts that this

---

[6] See note 1, *supra.*

second reconciliation was also unacceptable, because in some cases the resin debits were larger than the value of the outstanding invoices, which would not comport with the understanding that the value of the resins used in manufactured parts could not exceed the value of the manufactured parts.  (Pl. Mem., Dkt. 36 at 24.)

Crestmark initiated this lawsuit seeking release of the $332,000.00 escrow funds after it rejected this second reconciliation.  (*Id.* at 25.)

## II.   The Current Motions

### A. Defendant's Motion

Defendant Electrolux seeks summary judgment dismissing Crestmark's breach-of-contract claim, arguing that the Accommodation Agreement fails for lack of consideration. It further argues that the definition of "allowed set offs" in the Accommodation Agreement was impossible to satisfy, but that it otherwise complied with the terms and conditions of that agreement.  (Def. Mem., Dkt. 36 at 20.)

Defendant asserts that in exchange for wiring $100,000.00 to plaintiff, funding the $332,000.00 escrow account, and providing an

accounting and reconciliation for all open invoices and resins used, as well as forgoing its rights regarding the raw materials it had supplied to Tarheel, it was allowed to take possession of its own tooling and the parts already manufactured but not yet shipped.   (*Id.* at 20-21.) Defendant asserts that plaintiff had no legal right to the tooling because it was at Tarheel under a bailment agreement and defendant's first-priority rights to those tools were secured by a UCC financing statement.   (*Id.* at 23.)   As for the component parts, defendant argues that these were products purchased in the ordinary course of business between Electrolux and Tarheel and already subject to the agreement between these entities.   (*Id.* at 25-26.)   The right to take possession of the tooling and the component parts was not consideration, defendant asserts, because it already had this right, and "additional obligations are unenforceable" when they are taken on without additional consideration.   (*Id.* at 25) (quoting *Yerkovich v. AAA*, 610 N.W.2d 542, 546 (Mich. 2000).)

In what the Court understands to be an alternative argument, defendant also asserts that the requirement in the Accommodation Agreement to account for the resin "actually" used in the component

20

parts was impossible to fulfill, and that both defendant and plaintiff understood that this was impracticable. (*Id.* at 28-29.) Defendant explains that a promise is not binding on the parties when they both knew at the time they made the agreement that performance was impossible. (*Id.* (citing *Rogers Plaza, Inc. v. SS Kresge Co.*, 32 Mich. App. 724, 742-43 (1971).) Defendant argues that it has otherwise performed the terms of the Accommodation Agreement, has provided documentation demonstrating that it is owed $158,754.40 after taking an offset for the resins against its open invoices with Tarheel, and owes nothing to plaintiff. (*Id.* at 31.)

Plaintiff opposes, asserting that the Accommodation Agreement was negotiated between two sophisticated parties represented by prominent counsel, and that, as a result of this negotiated agreement, defendant received, without delay, the tooling and inventory free of plaintiff's lien. (Pl. Mem. in Oppos. at 8.) Plaintiff also argues that defendant is in breach of the Accommodation Agreement because its first reconciliation attempted to take setoffs for all raw materials, rather than only the resins used in manufactured component parts. (*Id.* at 12-13.) It also found the January reconciliation unacceptable in

21

meeting the specifications of the Accommodation Agreement by again asserting setoffs for resins not used to manufacture the component parts. (*Id.* at 15-16.)

Plaintiff cites Michigan caselaw for the rule that courts should uphold parties' freedom to contract, "avoiding technical or constrained constructions," and that even the slightest consideration will bind a contract. (*Id.* at 19-20 (quoting *Appalachian Railcar Servs., Inc. v. Boatright Enterprises, Inc.*, 602 F. Supp. 2d 829, 867 (W.D. Mich. 2008)).[7] Therefore, plaintiff, argues, plaintiff released its rights to the tooling and component parts in exchange for defendant's performance, and defendant failed to perform the reconciliation as required. (*Id.* at 20-21.)

As for defendant's argument that it was a buyer of the component parts in the ordinary course of business and therefore had a superior interest in the component parts, plaintiff argues against this proposition, because a purchaser in the ordinary course of business must give new value for the goods and actually take delivery and title

---

[7] Plaintiff cites *Coates v. Bastian Bros., Inc.*, 276 Mich. App. 498 (2007) for this proposition, and *Appalachian Railcar Servs., Inc.* cites to *Coates*; however, this quotation is not found in *Coates*.

22

from the seller, and defendant did not give new value.  (*Id.* at 24-25 (citing *In re H.S.A. II, Inc.*, 271 B.R. 534, 540 (E.D. Mich. 2002); *GMAC Business Credit, LLC v. Ford Motor Co.*, 100 F. App'x 404, 406 (6th Cir. 2004).)

The component parts were at the Tarheel facility, and when plaintiff declared Tarheel to be in default and asserted its lien on October 1, 2013, there was no contract between plaintiff and defendant; therefore, plaintiff asserts, it had no duty to defendant regarding the component parts.  (*Id.* at 25-26.)  Plaintiff also contends that it had an interest in the tooling at Tarheel, because Michigan law recognizes "the equitable right of a borrower to offset amounts due and owing" between two entities, (*Id.* at 26 (citing *Walker v. Farmers Ins. Exch.,* 226 Mich. App. 75, 79 (1997)), and no fact-finder or court of law had resolved the two competing interests in the tooling.  (*Id.* at 28.)  Finally, plaintiff asserts that the doctrine of impossibility does not apply to defendant's situation, in which an exact number was not required, and Electrulux did not provide even an estimate of the correct offset amount.  (*Id.* at 30-31.)

Defendant replies that plaintiff had no valid interest in the

tooling, because a security interest attaches to a debtor's rights in a particular asset, not the asset itself, and Tarheel never had any rights in defendant's tooling. (Def. Reply, Dkt. 43 at 2-4.) Defendant also reiterates that it had an existing agreement with Tarheel to ship the manufactured component parts; therefore, plaintiff's agreement to release them was not consideration. (*Id.* at 5.) Defendant also asserts that plaintiff misinterprets the caselaw regarding a buyer in the ordinary course of business, and that defendant held at least constructive possession of the component parts already manufactured but not yet shipped. (*Id.* at 6.)

### B. Plaintiff's Motion

Plaintiff moves for summary judgment granting it full rights to the $332,000.00 escrow account on the grounds that the Accommodation Agreement was a valid, enforceable contract that defendant breached. Plaintiff argues that rescission based on a failure of consideration must be for a "complete and total" failure, and in this matter, plaintiff's release of its lien over the component parts is at least partial consideration under the Accommodation Agreement. (Pl. Mem., Dkt. 36 at 30-31 (citing *Adell Broadcasting Corp. v. Apex Media Sales, Inc.*, 269

Mich. App. 6, 12 (2005).)   Plaintiff further asserts that defendant breached this valid contract by failing to provide a reconciliation that complied with the terms for what counted as allowable resin offsets under the Accommodation Agreement.  (*Id.* at 32.) [8]

As for defendant's counterclaims, plaintiff argues that defendant has not satisfied its burdens to demonstrate the elements for these claims.  It states that there are no facts to support an intentional wrongful act as required to establish tortious interference with contract or with business relationships.  (*Id.* at 35-39.)  Plaintiff also argues that the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, does not apply in this situation, and even if it did, defendant cannot demonstrate an "egregious or aggravating circumstance" or actions "in or affecting commerce" to meet the elements of this law.  (*Id.* at 40-43 (citing UDTPA, *Carcano v. JBSS, LLC*, 684 S.E.2d 41, 50 (N.C. Ct. App. 2009).)  As for unjust enrichment and conversion, plaintiff argues that the $100,000.00 wired by defendant was in exchange for the release of plaintiff's lien on the

---

[8] Plaintiff also asserts that defendant breached by missing the October 9, 2013 deadline for providing the reconciliation; however, defendant provides evidence that a one-day extension was allowed.  *See* discussion *supra*, p. 13.

component parts; therefore, there has been no conferral of a benefit or conversion of any property. (*Id.* at 44.) Finally, plaintiff moves to disregard defendant's affirmative defense of fraud and duress. The Accommodation Agreement was negotiated by sophisticated parties, plaintiff argues; therefore, defendant was not forced into unreasonable terms against its will. (*Id.* at 45.)

Defendant opposes, arguing that the Accommodation Agreement lacks consideration and therefore is not enforceable. (Def. Oppos., Dkt 41 at 15.) Defendant asserts that the terms of the existing offset relationship with Tarheel entitled it to receive the finished component parts without first tendering payment. (*Id.* at 16-18.) Defendant further argues that it complied with all the terms of the Accommodation Agreement that were not impossible (*id.* at 19-21), and that genuine issues of material fact prevent a finding of summary judgment regarding its counterclaims. (*Id.* at 22-33.) Specifically, defendant asserts that plaintiff's refusal to release the tooling—in which it had no interest—until the monies were wired was an intentional wrongful act. (*Id.* at 23.) Similarly, defendant asserts that plaintiff's refusal to release the component parts to defendant until monies were paid may

26

satisfy the criterion of an intentional act constituting tortious interference with the business relationship between defendant and Tarheel.  (*Id.* at 26.)

Plaintiff counters that it had a fully perfected and superior interest in the component parts, and that releasing this right was consideration for Electrolux's payments.   (Pl. Reply, Dkt. 44 at 5.) Plaintiff also asserts that its all-asset security interest attached to all of Tarheel's assets, and that its equitable right of setoff against Electrolux's unpaid invoices was rightfully applied to the Electrolux tooling.  (*Id.* at 7 (citing *Walker*, 226 Mich. App. at 79.)   As for the counterclaim based on the UDTPA, plaintiff argues that defendant has not made its showing that the UDTPA applies to this matter.  (*Id.* at 8-9.)   It also asserts that defendant's arguments regarding duress misapply caselaw.  (*Id.* at 11 (citing *Enzymes of Am. Inc. v. Deloitte, Haskins & Sells*, 207 Mich. App. 28, 35 (1994).)

## III.   LEGAL STANDARDS

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may

27

not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party bears the burden of persuasion at trial, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)(quotation omitted).  When the non-moving party would bear the burden of persuasion at trial, the moving party can meet its burden under Rule 56 in one to two ways: "[f]irst, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).  The reasoning behind this rests on the understanding that if the "nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law." *Id.* (citing *Anderson*, 477 U.S. at 249).

28

When reviewing cross-motions for summary judgment, courts "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir. 2006) (quoting *Westfield Ins. Co. v. Tech Dry, Inc.,* 336 F.3d 503, 506 (6th Cir. 2003)). It is not necessarily the case that judgment must be entered for one side or the other. *Id.* (citing *Parks v. LaFace Records,* 329 F.3d 437, 444 (6th Cir. 2003)); *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001). "Both parties, as movants, rely on inferences favorable to their own positions in seeking to obtain summary judgment," but in evaluating each motion, courts must still "tak[e] care in each instance to draw all reasonable inferences against the party whose motion is under consideration," because "the standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 247-48 (6th Cir. 1991) (internal citations omitted).

## IV.   ANALYSIS

### A. Evaluation of Property Rights

There are three categories of property that were held at the Tarheel plant in early October 2013, which are at the center of the parties' dispute over the enforceability of the Accommodation Agreement: the finished component parts not yet shipped to Electrolux, the resins not yet used to manufacture parts, and the tooling owned by Electrolux and used by Tarheel to manufacture parts.   These three types of property receive distinct treatment under the terms of the Accommodation Agreement, and they are also subject to distinct legal analyses.

The Accommodation Agreement, which both parties rely on in their motions, defined the $100,000.00 payment as the "Finished Goods Payment" and indicated that it was "in full satisfaction of all obligations to [Crestmark] and [Tarheel] with respect to such Finished Component Parts only." (Accommodation Agreement, Def. Mem., Ex. 11, Dkt. 38-12 at 1-2.)   The $332,000.00 escrow payment is defined as an "Interim Accounts Payment" subject to later reconciliation and potential offset against resins used in the manufacture of those parts.  (*Id.* at 2.)   The

30

resins and raw materials for which Electrolux had already taken an offset could be reclaimed by Electrolux, in exchange for a credit in favor of Tarheel.  (*Id.*)  Finally, the Accommodation Agreement allowed for the release to Electrolux of its tooling, which was itemized in Schedule 4.B, once the "Finished Goods Payment" and the "Interim Accounts Payment" had been made.

### 1. Finished Component Parts

The parties' rights to the finished component parts hinges on whether defendant was a buyer in the ordinary course of business. Under Michigan law, "a buyer in ordinary course of business . . . takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence. M.C.L. § 440.9320(1).  To be a "buyer in the ordinary course of business" one must participate in a sale that "comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices."  M.C.L. § 440.1201(2)(i).  Additionally,

> A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured

31

credit, and may acquire goods or documents of title under a preexisting contract for sale. *Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under article 2 may be a buyer in ordinary course of business.* The term does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

*Id.* (emphasis added). A buyer-in-ordinary-course relationship can be found in a situation like this one, where the buyer purchases and supplies the raw materials to the manufacturer and then offsets the costs of those raw materials from the cost of the finished product it purchases from the manufacturer. *Sensient Flavors, L.L.C. v. Crossroads Deb, L.L.C.*, No. 2009-027342, 2013 WL 5857604, at *6 (Mich. Ct. App. Oct. 31, 2013). The determination relies on whether the arrangement comported with the manufacturer's "own usual or customary practices." *Id.* (citing M.C.L. § 440.1201(9) [§ 440.1201(2)(i) since 2013]).

The Michigan statute also requires that a buyer in ordinary course has taken possession of the goods or has a right to recover them. M.C.L. § 440.1201(2)(i). In some circumstances, courts have found it unnecessary for the buyer to have taken possession to nonetheless be granted this exception to the priority of the secured interest. For

instance, if the industry custom is for the buyer not to have taken immediate possession of a product, the lack of physical possession may be irrelevant to the decision of whether it was a buyer in ordinary course of business. *Ace Equip. Sales, Inc. v. H.O. Penn Mach. Co.*, 871 A.2d 402, 406 (2005) (equipment dealer was buyer in ordinary course of heavy construction equipment not yet in its physical possession, because the industry custom was to take possession at the time it had a purchaser lined up) (citing *Chrysler Credit Corp. v. Sharp*, 288 N.Y.S.2d 525, 534 (Sup. Ct. 1968) (purchaser of a car out of dealer inventory with a valid contract and consideration given, but who had not yet taken title, was nonetheless buyer in ordinary course of business); *Fin. Am. Commercial Corp. v. Econo Coach, Inc.*, 454 N.E.2d 1127, 1130-31 (Ill. App. Ct. 1983) (whether transaction conforms with business custom is the "critical factor" for determination of buyer in ordinary course, not the actual delivery); *Holstein v. Greenwich Yacht Sales, Inc.*, 404 A.2d 842, 844 (R.I. 1979) (identification of the time in a sales contract was sufficient to create the buyer's possessory rights)).  And the "right to recover" is a term of art from the U.C.C. that applies when the seller repudiates the sales contract and maintains possession of the goods

despite a down payment having been made. *Hockensmith v. Fifth Third Bank*, No. 1:11-CV-173, 2012 WL 5969654, at *9 (S.D. Ohio Nov. 29, 2012) (discussing a similar provision in Ohio law). In such a case, the buyer has the right to replevin of the goods because of the seller's breach. *Id.*

In *Sensient*, the manufacturer, a company that manufactured products from cherries, received 99 percent of its cherries, as well as colorings and flavorings, from its primary customer, Sensient. *Id.* at *4. The manufacturer and buyer reconciled their accounts, off-setting the costs of the cherries and other raw materials against the invoices for finished product, on a weekly basis. *Id.* When the manufacturer ceased operations and defaulted on its loan, the lender attempted to apply its perfected security interest to the proceeds from the sale of finished products already in Sensient's possession at the time of the default. *Id.* at *2-3. The Michigan Court of Appeals upheld the trial court's determination that Sensient was a buyer in ordinary course of business who was rightly entitled to the finished product free of the lender's security interest, because these were goods already purchased by, and delivered to, Sensient. *Id.* at *5. The court further reasoned that

34

Sensient was the buyer in ordinary course because the transactions in question, including the offsets for raw materials, were conducted consistently with the manufacturer's "own usual or customary practices." *Id.* at *6.

In this matter, it is undisputed that the finished component parts were at Tarheel and not already in the physical possession of Electrolux. It is also not disputed that Tarheel and Electrolux had a customary business practice that involved Tarheel receiving raw materials paid for by Electrolux and then offsetting the value of those materials from the invoices for the finished component parts purchased by Electrolux. There is discussion of online purchase orders governing specific manufacturing projects assumed by Tarheel for Electrolux, but no evidence documents the specific component parts in question or any advanced payments or commitments Electrolux may have made that might suffice to establish its possessory interest or right of recovery in those specific component parts, as required to be a buyer in ordinary course of business.

In short, *Sensient* is distinguishable, since there the buyer already had possession of the finished product, which is not the case here. As a

matter of law, the Court finds that plaintiff's secured interest in all of Tarheel's assets included the finished component parts intended for sale to Electrolux, and defendant does not qualify for the buyer-in-ordinary-course exception to that interest.

## 2. Resins and Raw Materials

The rights to the resins and other raw materials purchased by Electrolux and stored at Tarheel for use in its manufacturing turn on the extent of Tarheel's rights over the resins in its inventory at the time it ceased operations. Article 9 of the UCC, encoded in Michigan as M.C.L. § 440.9101 *et seq.*, governs secured lending, and with an all-asset security interest such as plaintiff's, the debtor's inventory is considered an asset subject to that lien. Inventory includes "raw materials, work in process, or materials used or consumed in a business." M.C.L. § 440.9102(1)(uu).

There are three requirements for a security interest to attach to collateral: (1) the debtor signed a security agreement describing the collateral, (2) value has been given, and (3) the debtor has "rights in the collateral." *Litwiller Mach. & Mfg., Inc. v. NBD Alpena Bank*, 184 Mich. App. 369, 373 (1990) (quoting M.C.L. 440.9204(1)). For the debtor

36

to have sufficient "rights in the collateral," the interest must be more "than naked possession." *Id.* at 375 (quoting with approval *Booth Co. v. Tiara Furniture, Inc.*, 564 P.2d 210, 214 (Okla. 1977)). A debtor's having "the right to incorporate the materials into a product for sale, to use the materials and to sell the finished product" to the buyer who provided the materials is sufficient to attach a lender's security interest in the debtor's assets. *Id.*

In *Littwiller Mach. & Mfg., Inc.*, the court found that preformed steel parts provided by the purchaser to the manufacturer for assembly into products for the purchaser were part of the manufacturer's inventory and subject to the perfected security interest of the lender. *Id.* at 373-74. The court reasoned that the lien included inventory, and raw materials used in manufacturing are part of that inventory if the manufacturer had the right to transform them into a product for sale. *Id.* And in *GMAC Business Credit, L.L.C. v. Ford Motor Co.*, the Sixth Circuit relied on this *Litwiller Mach. & Mfg., Inc.* holding to support its reasoning that transforming raw materials into manufactured products was more than the "naked possession" found in a bailment, and therefore the debtor had sufficient rights to collateralize the raw steel

supplied by Ford to the debtor for manufacture into products Ford would then purchase.  100 F. App'x 404, 408-09 (6th Cir. 2004).  The manufacturer's ability to use the steel supplied by Ford to create "a wholly new product" was a right in that steel substantial enough for it to be collateral secured by the lender.  *Id*.

A buyer-lender of materials used in the manufacture of the items it subsequently purchases from the manufacture can "easily protect itself from after-acquired property creditors of its contractor by filing a [UCC] Article Nine purchase money security interest in the goods supplied to it by the contractor, as well as those purchased or otherwise identified in the contract by the contractor."  *Litwiller Mach. & Mfg., Inc.*, 184 Mich. App. at 377 (quoting with approval *Kinetics Technology International Corp. v. Fourth National Bank of Tulsa*, 705 F.2d 396, 399-400 (10th Cir. 1983)).[9]

The above caselaw dictates the outcome here, where Tarheel had the right to create a wholly new product from the resins purchased and supplied to Tarheel.  In the absence of a purchase-money security

---

[9] A purchase-money security interest enables a party that supplies goods to another party, or that provides financing for the acquisition of those goods, to obtain a priority interest above other secured lenders in those goods.  M.C.L. § 440.9103.

38

interest—a tool that likely would have protected Electrolux's interest in the raw materials from Crestmark's all-asset lien—Electrolux has no legal basis on which to assert any rights over raw materials in Tarheel's inventory at the time it ceased operations.

### 3. Tooling and Molds

Both parties agree that tooling and molds owned by Electrolux were at the Tarheel plant to be used in the manufacture of component parts for Electrolux. However, the undisputed facts in the record do not clearly establish the rights of each party regarding all of this property.

Defendant recorded its secured bailment of *some* of its tooling on December 28, 2011, which is prior to November 5, 2012, when Crestmark first perfected its lien. However, the Tooling Agreement provided by defendant was signed on February 8, 2013, after Crestmark perfected its security interest, and itemizes a *different* list of tools from the 2011 UCC statement. And defendant's March 1, 2013 letter to plaintiff advising it of the bailment of tools at Tarheel does not append any list of tools—whether from the 2011 list or the 2013 list. While it appears that the combination of tooling itemized between the 2011 UCC filing and the 2013 Tooling Agreement accounts for the entirety of what

is itemized on Schedule 4.B of the Accommodation Agreement—*see* discussion *supra*, pages 11-12— at the time Crestmark secured its loan with Tarheel, it only had notice of the tooling on the 2011 UCC statement.   This subgroup of itemized tools was indisputably the property of defendant at the time Tarheel ceased operations, and at no time did plaintiff have any rights to this equipment.

As for the rights of the parties regarding the tools itemized in the February 2013 Tooling Agreement and on the second and third pages of Schedule 4.B. of the Accommodation Agreement, the determination of the parties' rights depends on the terms of the security agreement between plaintiff and Tarheel, as well as the Tooling Agreement between defendant and Tarheel.   The security agreement between plaintiff and Tarheel banned any other liens, claims or security interests in Tarheel's inventory and equipment.   *See* discussion *supra*, page 7.   However, the 2013 Tooling Agreement, entered into *after* the security agreement, established a bailment of tools that could not become otherwise encumbered by Tarheel, required clear labeling of the tools in the agreement, and established that Tarheel could assert no

40

rights over the tooling. *See* discussion *supra*, page 4.[10] These two

obligations entered into by Tarheel are in clear conflict with each other

regarding the tools itemized in the 2013 Tooling Agreement, and the

record lacks evidence to determine what, if any, exceptions or

understandings between the three parties may have allowed the 2013

Tooling Agreement to be executed despite these conflicts.

Seeing as neither party addressed through evidence or argument

the conflicting security interests in this specific subset of tooling

supplied by defendant, the Court has no basis to determine the rights in

this equipment.

### B. Defendant's Motion

Defendant primarily asserts that the Accommodation Agreement

---

[10] The elements of a "bailment" under Michigan law require that one person deliver personal property "to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished." *In re H.S.H. II Inc.*, No. 02-cv-70297, 2002 WL 32819769, at *3 (E.D. Mich. Sept. 30, 2002) *aff'd sub nom. GMAC Bus. Credit, L.L.C. v. Ford Motor Co.*, 100 F. App'x 404 (6th Cir. 2004) (quoting *In re Zwagerman*, 115 B.R. 540, 547 (W.D. Mich. 1990). An indicium of a "true bailment" can be the bailor's assumption of the responsibility for cost and maintenance of the property under bailment. *Id.* Here, even in the absence of the express contract—that is, the 2013 Tooling Agreement—defendant's provision of its equipment to Tarheel for the sole purpose of manufacturing parts for sale to defendant would constitute a bailment. *See GMAC Bus. Credit, L.L.C.*, 100 F. App'x at 407-09.

is unenforceable because it lacked consideration by plaintiff in exchange for the performance by defendant—that is, plaintiff gave up no rights in exchange for the funds defendant paid and other performance. Here, the burden falls to defendant to prove a failure of consideration. *Adell Broadcasting,* 269 Mich.App. at 12. But the record establishes that plaintiff had rights through its all-asset lien to the component parts, and it released its rights in exchange for payment and a reconciliation of accounts achieved through a negotiation between two sophisticated parties. *See* section IV.A.1, *supra.* Plaintiff was under no legal obligation to turn over the finished component parts to defendant; therefore, the Accommodation Agreement was based on a new promise and not plaintiff's preexisting duty. *See Yerkovich*, 461 Mich. at 740-41.

Even isolating the issue of which party held a priority right to the equipment defendant provided to Tarheel, defendant cannot prevail on its motion based on a lack of consideration for the Accommodation Agreement. As explained in section IV.A.3, *supra*, defendant's rights to the 2011 tooling is unassailable, but the record does not illuminate beyond a triable issue of fact whether defendant held a priority interest over plaintiff in the tooling itemized in the 2013 Tooling Agreement.

42

Considering the very high bar to demonstrate that a contract between two sophisticated parties lacked consideration, defendant cannot establish that plaintiff had no rights to any of the tooling at Tarheel and therefore received defendant's performance without any consideration. *See B.A. Const. & Mgmt., Inc. v. Knight Enter., Inc.*, 365 F. App'x 638, 645 (6th Cir. 2010) (citing *Harris,* 329 Mich. 136, 45 N.W.2d at 9); *see also Kessler*, 1995 WL 871156 at *4 (quoting *Rose*, 40 Mich. App. at 235-36).

Defendant's alternative argument, that it performed fully on the Accommodation Agreement, other than the reconciliation, which was impossible, is also unavailing.

> [T] the essence of the modern defense of impossibility is that the promised performance was at the making of the contract, or thereafter became, impracticable owing to some extreme or unreasonable difficulty, expense, injury, or loss involved, rather than that it is scientifically or actually impossible. . . . The important question is whether an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract.

*Nathan v. Brownstone Plastics, LLC*, 511 B.R. 863, 866-67 (E.D. Mich. 2014) (quoting *Bissell v. L. W.Edison Co.,* 9 Mich.App. 276, 156 N.W.2d

623, 626–27 (Mich. Ct. App. Dec. 8, 1967)).  It may very well have been impracticable for either party to calculate the exact amount of resin *actually* used to make the component parts; however, defendant has not provided sufficient uncontroverted evidence that this was the only measure or accounting for the resin that would have been acceptable performance under the Accommodation Agreement.  Both parties have provided evidence to establish that resins constituted between sixty percent and sixty-six percent of the value in the component parts.  *See* discussion *supra*, page 18.  Indeed, plaintiff offered to resolve the entire dispute by accepting an estimate in that range to determine the total allowable resin offset.  *See* discussion *supra*, page 18-19.  Defendant has not demonstrated that impossibility excuses its failure to provide a reconciliation of resin offsets with the invoices for finished component parts, as required by the Accommodation Agreement.

Defendant does not address its counterclaims in its motion; therefore, the Court does not consider these counterclaims with regard to defendant's motion.

### C. Plaintiff's Motion

First, the Court finds that the Accommodation Agreement is a

valid, enforceable contract, negotiated between two sophisticated parties for adequate consideration. For the Court to find the contract unenforceable, defendant had the burden to prove that the Accommodation Agreement lacked consideration. *Adell Broadcasting,* 269 Mich. App. at 12. But plaintiff has negated this assertion by demonstrating that its all-asset lien extended to the finished component parts, and that relinquishing its rights in this property is sufficient to constitute valid consideration for the entirety of the Accommodation Agreement. *See Barden Detroit Casino, L.L.C. v. City of Detroit*, 59 F. Supp. 2d 641, 669 (E.D. Mich. 1999) *aff'd* 230 F.3d 848 (6th Cir. 2000) ("It is only when the record establishes that the consideration given was so grossly inadequate as to shock the conscience that courts will intervene.") (internal quotation omitted).

The contract is also valid despite defendant's contention that fraud and duress render it otherwise. Michigan law requires an illegal or unlawful act be asserted in the pleadings to establish duress. *Whirlpool Corp. v. Grigoleit Co.*, 713 F.3d 316, 324 (6th Cir. 2013) (citing cases). "The question as to what constitutes duress is a matter of law, but whether duress exists in a particular case is a question of fact."

*Norton v. Michigan State Highway Dep't*, 315 Mich. 313, 319-20 (1946). Duress exists when this unlawful act induces a party "to make a contract or perform some act under circumstances which deprive him of the exercise of free will." *Id.* at 320 (internal citations omitted). Duress may also arise

> in imposition, oppression, under influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another; the theory under which relief is granted being that the party profiting thereby has received money, property or other advantage, which in equity and good conscience he ought not to be permitted to retain.

*Id.* (internal citation omitted). Assuming for the sake of argument that plaintiff committed an unlawful act—even though there is no such showing[11]—the facts, construed in the light most favorable to defendant, would still need to show that such an illegal act deprived defendant of its free will or otherwise created a severe inequity that the Court must correct. Defendant is a sophisticated entity represented by counsel from the initial stage of negotiation, and it was fully capable of asserting its rights regarding the tooling at Tarheel over which it had a

---

[11] *See* discussion in section IV.C.2.c, *infra*, dismissing the counterclaim of violation of North Carolina's Unfair and Deceptive Practices Act.

46

priority interest. *See*, *e.g. Hungerman v. McCord Gasket Corp.*, 189 Mich. App. 675, 677, 473 N.W.2d 720, 721 (1991) (finding no duress where plaintiff employee was represented by counsel when signing a release of rights against employer). There is no evidence, for instance, that defendant provided plaintiff with an itemized list of equipment in which it held the priority interest and was entitled to immediate possession. And plaintiff has provided sufficient evidence that neither fraud nor misrepresentation were present in the negotiations of the Accommodation Agreement.

In short, the Accommodation Agreement is a valid, enforceable contract.

### 1. Breach of Contract

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 495 Mich. 161, 178, 848 N.W.2d 95, 104, *reh'g denied*, 495 Mich. 998, 845 N.W.2d 742 (2014) (citing *Stevenson v. Brotherhoods Mut. Benefit*, 312 Mich. 81, 90-91 (1945)). Plaintiff establishes beyond a triable fact that the plain

47

language of the Accommodation Agreement required defendant to reconcile only the value of resins it provided that were used in finished component parts. Both parties agree that the reconciliation provided in October 2015 failed to adhere to the terms of the Accommodation Agreement. *See* discussion *supra*, pages 16-17. And, while the parties disagree on the value of the allowable resin offsets and, apparently, the value of the component parts received by Electrolux on open invoices, it is not disputed that resins would constitute at least sixty percent of the component parts.

The Court finds that defendant breached the Accommodation Agreement by failing to provide a reconciliation of resin offsets against open invoices; however, the significant discrepancies between the exhibits create a triable issue of fact regarding the amount of plaintiff's damages. The most the Court is able to determine is that defendant may not offset resins it provided to Tarheel for two reasons: first, the raw materials in inventory at the time Tarheel ceased operation are, as a matter of law, subject to the rights of plaintiff's all-asset lien, and second, the plain language of the Accommodation Agreement prohibits defendant from offsetting the resins not used in finished component

parts. Therefore, given that only the resins used in the component parts may be offset against the invoices, it is not possible, as defendant asserts, that plaintiff owes defendant. Rather, it must be the case that defendant owes plaintiff on the open invoices, even after resins are offset, albeit the amount owed cannot be discerned from the parties' motion papers.

## 2. Defendant's Counterclaims

Plaintiff seeks dismissal of defendant's counterclaims as well. For the reasons provided below, the Court finds that summary judgment is warranted in favor of plaintiff with regard to all but one of defendant's counterclaims.

### a. Tortious Interference with Contract

Tortious interference with a contract requires "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich. App. 83, 89-90 (2005). Under Michigan law,[12] the third element of this involves a showing of "a *per se*

---

[12] The Accommodation Agreement is governed by Michigan law; therefore the

wrongful act or committed a lawful act with malice and without justification for the purpose of invading the contractual rights or business relationship of another." *Urban Associates, Inc. v. Standex Elecs., Inc.*, 216 F. App'x 495, 514 (6th Cir. 2007) (internal quotations omitted). "A *per se* wrongful act is one that is 'inherently wrongful or an act that can never be justified under any circumstances.'" *Id.* (quoting *Prysak v. R.L. Polk Co.*, 193 Mich. App. 1, 13 (1992)). And when a party's actions are "motivated by legitimate business reasons," a court will not find the improper motive necessary for tortious interference with contract. *Id.* (citing *Prysak*, 193 Mich. App. at 13).

Here, plaintiff demonstrates, and defendant does not dispute, that in addressing Tarheel's default, it lacked documentation regarding the resin offset program with defendant and the tooling purportedly belonging to defendant. Plaintiff also shows, and defendant does not dispute, that defendant initiated negotiations regarding an accommodation to allow for return of its property. And the law supports plaintiff's claims regarding its rights to the finished component parts and raw materials at the plant, even though there are

---

claim for tortious interference with contract is governed by Michigan law.

unresolved rights to a portion of the tooling at Tarheel. Defendant attempts to paint a picture in which Crestmark used the two Tarheel minority owners' personal guarantees on the loan to pressure them into preventing Electrolux from gaining access to the component parts and tooling in the immediate aftermath of the plant shutdown. (Def. Oppos. Mem., Dkt. 41 at 10.) However, even taking this assertion at face value, such pressure—reminding the defaulted parties of their personal guarantees on an outstanding loan amount of over $1,000,000.00 and seeking their cooperation in maximizing the value of the remaining collateral on that loan—is not a wrongful act.

There is no reasonable way to view these facts as supporting a finding that plaintiff's steps to resolve and secure the collateral, even if in doing so it was aware of defendant's dire urgency, was an inherently wrongful act that can never be justified under any circumstances.

### b. Tortious Interference with Business Relations

To establish tortious interference with business relations, defendant must show: "(1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of

51

the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted." *Health Call of Detroit*, 268 Mich. App. at 89-90 (internal citations omitted); *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 323 F.3d 396, 404 (6th Cir. 2003). Here, too, the third element requires "that the interference was either (1) a *per se* wrongful act or (2) a lawful act done 'with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.'" *Wausau Underwriters Ins.*, 323 F.3d at 404 (quoting *Clark v. West Shore Hospital*, 16 F. App'x 421, 430 (6th Cir. 2001)). And courts will not find tortious interference with business relationships "[w]here the defendant's actions were motivated by legitimate business reasons." *Id.* (quoting *BPS Clinical Labs. v. Blue Cross and Blue Shield of Mich.,* 217 Mich. App. 687, 699 (1996)).

For the same reasons that applied to the prior counterclaim, defendant has failed to raise a material fact to show that business reasons did not motivate plaintiff's actions to assert its rights in the collateral for the defaulted Tarheel loan; therefore, plaintiff was not

engaging either in unlawful action or lawful acts for an unjustified purpose. Summary judgment for plaintiff is warranted on this counterclaim.

### c. Unfair and Deceptive Trade Practices

The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen Stat. § 75-1.1, primarily seeks to protect consumers, but a business may assert a claim under the UDTPA against another business. *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 519-20 (4th Cir. 1999) (citing North Carolina Supreme Court cases ). A *prima facie* case under the UDTPA requires a showing that "(1) the defendant committed an unfair or deceptive trade practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff." *Gilbert v. Residential Funding LLC*, 678 F.3d 271, 280 (4th Cir. 2012) (citing *Spartan Leasing v. Pollard,* 400 S.E.2d 476, 482 (N.C. Ct. App. 1991)).

"An act is unfair when it is unethical or unscrupulous, and it is deceptive if it tends to deceive." *Id.* (citing *Marshall v. Miller,* 276 S.E.2d 397, 403 (N.C. 1981)). Whether conduct is "unfair or deceptive" is a question of law, and the UDTPA will only apply when a showing of

53

"some type of *egregious* or *aggravating* circumstances" has been made. *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001) (emphasis in original, internal quotations omitted).  While there is no precise definition for "unfair," the hallmark of an unfair practice is "conduct which amounts to an inequitable assertion of [a party's] power or position." *Carcano v. JBSS, LLC*, 684 S.E.2d 41, 50 (N.C. Ct. App. 2009) (citing *McInerney v. Pinehurst Area Realty, Inc.,* 590 S.E.2d 313, 316–17 (N.C. Ct. App. 2004)).  "The 'relevant gauge' of an act's unfairness or deception is '[t]he effect of the actor's conduct on the marketplace.'" *Id.* (quoting *Ken–Mar Finance v. Harvey,* 368 S.E.2d 646, 648, *disc. review denied,* 373 S.E.2d 545 (N.C. 1988) (alteration in original)).  For instance, in *Carcano*, the court found that inviting investment in a fictional company did not violate the UDTPA, reasoning that "[t]hese are actions which are capital raising ventures among sophisticated business entrepreneurs," and in any event, there was no impact on the market or inequitable assertion of power.  *Id.* at 173.

As explained in section IV.C.2.a *supra*, plaintiff has shown that its actions during the days immediately prior to and after Tarheel defaulted on its loan were motivated by a need to secure the collateral

at Tarheel. Plaintiff had a priority secured interest in the inventory, including raw materials and after-acquired equipment, at Tarheel's facility. Asserting ones priority over collateral may be unpalatable to the less secured party, but it is legitimate conduct and not inequitable. Moreover, there are no claims that any market impact resulted from plaintiff's actions.

Even isolating the subset of the tooling secured in 2011 over which defendant had a priority right, plaintiff has made a sufficient showing that its actions were not so "egregious" or "aggravating" to trigger a violation of the UDTPA. The record does not show that in defendant's communications with plaintiff it provided documentation of its equipment to clarify its priority right in the face of plaintiff's blanket assertions regarding all of Tarheel's assets. While plaintiff's knowing refusal to release equipment to the priority secured party might very well constitute egregious conduct in some situations, it is not the case here, where plaintiff held a secured interest in after-acquired equipment, and there may have been legitimate confusion over the rights to the equipment acquired after the loan commenced. Therefore, its refusal to release that equipment in the absence of any clarity

55

regarding which equipment was subject to defendant's preferred status cannot be construed as egregious. Furthermore, even if there had been an unfair or deceptive act by plaintiff, the record does not document that Electrolux suffered any injury as a result of being forced to wait until after the Accommodation Agreement was executed to remove its tooling from the Tarheel facility.

Crestmark has succeeded in demonstrating that Electrolux cannot meet its burden to establish a violation of the UDTPA; therefore, summary judgment in favor of plaintiff/counter-defendant is warranted.

### d. Unjust Enrichment

Defendant/counter-plaintiff's assertion of unjust enrichment is also unavailing. Unjust enrichment is an equitable doctrine "by which 'the law sometimes indulges in the fiction of a quasi or constructive contract, with an implied obligation to pay for benefits received' to ensure that 'exact justice' is obtained." *Kammer Asphalt Paving Co. v. E. China Twp. Sch.*, 443 Mich. 176, 185-86 (1993) (quoting *Detroit v. Highland Park*, 326 Mich. 78, 100 (1949)). Courts will not apply the doctrine "when an express contract already addresses the pertinent subject matter." *Liggett Rest. Grp., Inc. v. City of Pontiac*, 260 Mich.

App. 127, 137-38 (2003) (citing *Barber v. SMH (US), Inc.*, 202 Mich. App. 366, 375 (1993)).

Here, the Accommodation Agreement is an enforceable contract between the two parties addressing the rights to the inventory and tooling at Tarheel. *See* discussion *supra*, section IV.C.1. The Court can not employ the doctrine of unjust enrichment in a matter covered by an express contract between the two parties, and summary judgment for plaintiff/counter-defendant is granted.

### e. Conversion

The one counterclaim for which summary judgment will not be entered for plaintiff/counter-defendant is the charge of conversion. Michigan law defines conversion "as 'any distinct act of domain wrongfully exerted over another's personal property in denial or inconsistent with the rights therein.'" *Hunt v. Hadden*, No. 14-10713, 2015 WL 3473680, at *5 (E.D. Mich. June 2, 2015) (quoting *Dep't of Agriculture v. Appletree Mktg., L.L.C.*, 485 Mich. 1, 13-14 (2010)). Conversion may occur under Michigan law "when a party properly in possession of property uses it in an improper way, for an improper purpose, or by delivering it without authorization to a third party." *Id.*

57

at *5 (quoting *Appletree Mktg., L.L.C.*, 485 Mich. at 15).   While conversion is an intentional tort, "*the tort can be committed unwittingly if unaware of the plaintiff's outstanding property interest.*" *In re Pixley*, 456 B.R. 770, 787-88 (Bankr. E.D. Mich. 2011) (emphasis in original) (quoting *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391 (1992)).

Here, Electrolux has provided evidence of its priority secured interest in the subset of tooling itemized on the 2011 financing statement, and Crestmark has not provided evidence that its refusal to immediately release that subset of tooling was based on a proper right to exercise such domain.   Since intentionality is not a requirement to establish conversion, it is of no relevance whether Crestmark actually knew of Electrolux's priority interest in this subset of the tooling; after all, it entered its 2012 security agreement with notice of the filed interest in that tooling.   It is not clear what, if any, damages inure to defendant/counter-plaintiff on this claim, and none is specified in its pleading; nonetheless, this matter presents a triable issue of fact.   *See Even-Heat Co. v. Wade Elec. Products Co.*, 336 Mich. 564, 572 (1953) (Conversion may be found in cases where "there may be a deprivation

which is only partial or temporary, and where the property of the plaintiff remains in or is restored to him," and in such cases damages are "commonly less" than the whole value of the property.).

## V.   CONCLUSION

For the reasons stated above, defendant's motion for summary judge (Dkt. 35) is DENIED, and plaintiff's motion for summary judgment (Dkt. 36) is GRANTED in part and DENIED in part. Plaintiff's motion is hereby GRANTED with regard to the breach-of-contract claim (although the issue of damages remains for trial) and the counter-claims for tortious interference with contract, tortious interference with business relationships, violation of the UTDPA, and unjust enrichment.  Plaintiff's motion is hereby DENIED with regard to the counter-claim for conversion, but only for the subset of Electrolux tooling with a 2011 perfected security interest.

It is hereby ORDERED that the parties submit in their joint final pretrial order the evidence that will be used to address the remaining triable issues identified herein.  It is further ORDERED that, by no later than February 23, 2016, the parties may submit new motions *in limine*, if needed, consistent with this order, or inform the Court

regarding the status of their motions already submitted.   The scheduling ordered entered on December 9, 2015 otherwise remains in effect.

IT IS SO ORDERED.


Dated:       January 7, 2016          s/ Judith E. Levy
             Ann Arbor, Michigan      Judith E. Levy
                                      United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 7, 2016.


s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

60